# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

PATRICK CROWE,

     Plaintiff,

  v.

UNITED STATES OF AMERICA; ROSCOE RAMSEY; JOHN DOES 1-7; NAPHCARE, INC.

    Defendants.

**Case No. 5:22-cv-335**

**Jury Trial Demanded**

## AMENDED COMPLAINT

Plaintiff Patrick Crowe ("Mr. Crowe"), by and through his undersigned counsel, brings this Complaint against the United States of America ("Defendant U.S.") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., 28 U.S.C. § 1346(b)(1); against Medical and Prison Staff, both known[1] and unknown[2] in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the Eighth Amendment to the Constitution of the United States of America, and against NaphCare, Inc., (collectively "Defendants"), a medical contractor for the Federal Bureau of Prisons ("BOP").

---

[1]    Roscoe Ramsey.

[2]    There are several unknown medical and prison staff members who were employees of the Bureau of Prisons ("BOP") whose wrongful acts, neglect, default, and wanton disregard for Plaintiff's health resulted in his deformity.

## INTRODUCTION

Mr. Crowe was incarcerated in multiple federal facilities from November 2014 through April 2022. From 2018 through 2022, Defendants were reckless in their treatment of Mr. Crowe's left foot, which caused serious injury, and were then subsequently deliberately indifferent to the deteriorating condition of Mr. Crowe's left foot. As a direct result of Defendants actions, or lack thereof, Mr. Crowe's left foot has become completely deformed, and may require amputation. Mr. Crowe now brings this action for damages.

## PARTIES TO COMPLAINT

1. Mr. Crowe is a resident of Franklin County, Virginia.

2. At all times material to this action, Mr. Crowe was an inmate in the custody of the BOP, and during certain relevant time periods was assigned to the United States Penitentiary located in Butner, North Carolina, a correctional facility owned and operated by Defendant U.S.

3. Defendant U.S. is subject to suit for personal injury caused by the negligent and wrongful acts and omissions of employees of the Government while acting within the course and scope of their office or employment, under the circumstances where the Defendant, if a private person, would be liable to the Plaintiff, pursuant to the FTCA.

4. At all times material to this action, Defendant U.S. was responsible for the correct and prompt response to the health care and disability needs of inmates in its custody.

5. At all times material to this action, Mr. Crowe was an inmate subject to the custody and control of Defendant U.S. and subject to the care and treatment of Defendant U.S. for any and all medical evaluation and treatment.

6. At all times material to this action, if Mr. Crowe required medical evaluation or treatment, his only avenue was to rely on the medical evaluation and treatment provided by Defendant U.S.

2

7. Roscoe Ramsey is a medical doctor employed by Defendant U.S. at all times relevant to this Complaint.

8. Naphcare, Inc., is a medical contractor for the BOP and provides comprehensive medical care to inmates at FCI Fort Dix. NaphCare is required to maintain its own medical liability insurance and to ensure that professional personnel have appropriate educational qualifications, experience, and licensure. Barry Wisler was a physician providing podiatry services at FCI Fort Dix as an employee of NaphCare, Inc.

## RELEVANT PARTIES

9. Brandon Jones is a Physician's Assistant employed by Defendant U.S. at all times relevant to this Complaint.

10. Stephen Berry is a Physical Therapist employed by Defendant U.S. at all times relevant to this Complaint.

11. Douglas Henry is a Physical Therapist employed by Defendant U.S. at all times relevant to this Complaint.

12. Carl Sceusa is the resident medical doctor at Fort Dix, employed by Defendant U.S. at all times relevant to this Complaint.

13. Barry Wisler is a podiatrist employed by Naphare, Inc., at all times relevant in this Complaint.

14. John Doe Corporation 1 is an outside contractor of the BOP that works to design and create medical products, such as joint and limb braces, to correct bone abnormalities and other medical issues.

## JURISDICTION

15. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States of America and is premised on the acts

3

and omissions of Defendant U.S. and its agents acting under color of federal law. This Court further has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) in that this is a claim against the Defendant United States of America, for money damages, accruing on or after January 1, 1945, for personal injury caused by the negligent and wrongful acts and omissions of employees of the Government while acting within the course and scope of their office or employment, under the circumstances where Defendant U.S., if a private person, would be liable to Mr. Crowe.

16. Jurisdiction founded upon the federal law is proper in that this action is premised upon federal causes of action under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2671, *et. seq.*, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

17. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S. Code § 1367, as the state law claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

18. Pursuant to the FTCA, Mr. Crowe on or about October 29, 2019, presented his claim to the appropriate federal agency for administrative settlement under the FTCA requesting $5,000,000.00. By letter dated February 11, 2021, nearly one and a half years later, Mr. Crowe's claim was denied in writing by the Mid-Atlantic Regional Office of the Federal Bureau of Prisons and such denial was sent by certified or registered mail to Plaintiff. (Claim #TRT-NER-2020-02587). The denial letter stated that Mr. Crowe failed to provide supporting documents. Subsequently, on March 22, 2021, Mr. Crowe sent a letter to the Mid-Atlantic Regional Office with supporting documents, and requested that the BOP rescind their denial, review the supporting

documents, and issue a new determination. On May 4, 2021, the BOP confirmed to Mr. Crowe via letter that they would accept his request for reconsideration and rescind their denial. However, to this day the BOP has not issued Mr. Crowe a final denial of his claim in writing by certified or registered mail, or a statement that Mr. Crowe may file suit in an appropriate U.S. District Court not later than 6 months after the date of mailing of the notification, as required pursuant to 28 U.S.C. § 2401(b). This lawsuit was then timely filed.

19. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as Defendant U.S. does business in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**FACTS**

20. This is a civil rights, medical malpractice, and products liability action asserting willful, reckless, and wanton negligence in connection with actions and/or omissions of the United States, individual known and unknown medical providers and prison staff members, and an unknown manufacturer of a foot and ankle brace, leading to the deformity and injury of Mr. Crowe's left foot, which may lead to an amputation.

21. After being convicted of white collar crimes, Mr. Crowe surrendered to a Low Security Correctional Institution in Jesup, Georgia in October 2014, and was then transferred by the BOP to Butner, North Carolina in November 2014.

**2018**

22. On May 17, 2018, Mr. Crowe met with Physician Assistant ("PA") Brandon Jones for the removal of a callus on Mr. Crowe's right foot. PA Jones referred Mr. Crowe to a physical therapist for the callous removal and also referred Mr. Crowe for an X-ray study on Mr. Crowe's left foot,

5

which had a fallen arch—a condition Mr. Crowe had managed for over twenty years. Mr. Crowe's left foot was stable at this time, and not hindering him in any way.

23. On May 23, 2018, the X-ray of Mr. Crowe's left foot revealed no evidence of acute fracture or dislocation.

24. On June 1, 2018, Physical Therapist ("PT") Stephen Berry removed the callous on Mr. Crowe's right foot. PT Berry issued Mr. Crowe compression stockings for lower leg swelling and ordered Mr. Crowe a new pair of soft shoes. PT Berry's report stated that Mr. Crowe's gait was "steady."

25. On August 31, 2018, PT Berry issued Mr. Crowe a new pair of medical soft shoes and a pair of arch supports which PT Berry "found in a closet."

26. Mr. Crowe used the arch support for two days in early September of 2018. On the second day Mr. Crowe developed a sudden sharp pain in his left foot, and immediately ceased using the arch supports. However, as a result of using the arch supports for just two days, Mr. Crowe experienced severe pain in his left foot with each step that he took. To combat the pain Mr. Crowe was consuming four ibuprofen per day. However, Mr. Crowe's pain was so severe that he still had trouble walking regardless of the pain relievers he took.

27. The pain Mr. Crowe was experiencing was so severe that he came to believe that he fractured his foot as a result of using the arch supports.

28. As a result of his extreme pain Mr. Crowe sought medical attention.

29. On September 24, 2018, Mr. Crowe met with Dr. Roscoe Ramsey, and Mr. Crowe explained his severe pain to Dr. Ramsey.

30. Dr. Ramsey refused to examine Mr. Crowe's left foot. Instead, Dr. Ramsey speculated that the arch supports were too high, and prescribed Mr. Crowe 500 mg of naproxen to be taken twice per day to counteract the pain.

31. Mr. Crowe's pain in his left foot did not improve.

32. Between September 2018 through November 2018 Mr. Crowe saw PT Berry multiple times to attempt to resolve the pain with his left foot. Mr. Berry informed Mr. Crowe that his left foot pain was increasing because Mr. Crowe actually needed a combined foot and ankle brace—not arch supports. PT Berry never gave Mr. Crowe any medical justification for needing to wear a foot and ankle brace.

33. Mr. Crowe was issued a cane for his gait, which had now become unsteady.

34. Mr. Crowe was then directed to work with a John Doe Corporation 1 over the course of multiple visits, who worked to design and create a foot and ankle brace for Mr. Crowe to wear in his shoe.

35. On November 20, 2018, PT Berry finally provided Mr. Crowe with the foot and ankle brace, but spent less than five minutes explaining to Mr. Crowe how to use the brace and how to strap it around his lower leg. Mr. Crowe was not advised as to how the BOP would monitor his progress, and was not told what the brace was supposed to accomplish.

36. When Mr. Crowe returned to his living area to wear the brace for the first time, he realized that the shoes provided to him were too small to accommodate his foot and ankle brace. Thus, Mr. Crowe did not begin wearing the brace.

37. On December 13, 2018, PT D. Henry (first name unknown) replaced PT Stephen Berry, and PT Henry reviewed Mr. Crowe's file for the first time.

**2019**

38. On January 9, 2019, Mr. Crowe conducted his initial interview with PT Henry. PT Henry agreed to find larger shoes for Mr. Crowe so that Mr. Crowe could wear the brace that PT Berry helped create. PT Henry stated he had never seen anything like the brace PT Berry helped create, and PT Henry took pictures of the brace to show his colleagues.

7

39. On January 15, 2019, Mr. Crowe met again with PT Henry, who provided Mr. Crowe with a pair of shoes large enough so Mr. Crowe could start wearing the brace designed for him. Mr. Crowe insisted, due to increased pain, that something happened to his foot in September of 2018 and Mr. Crowe wanted it to be X-rayed.

40. Two weeks later, on January 29, 2019, Mr. Crowe met with PT Henry at the Federal Medical Center Butner to have his foot X-rayed, and for PT Henry to check on Mr. Crowe's progress with the brace.

41. After reviewing the X-ray taken on January 29, 2019, the examiner wrote that "[t]here is deformity on the mid and hind foot with either a fracture or misalignment of the calcareous." This is the first document which demonstrates Mr. Crowe fractured his foot in September of 2018—a fracture which Mr. Crowe sought medical attention for, but was not even examined until approximately 4 months later. However, despite this confirmation of a potential fracture, the report went on to falsely state that overall the appearance was unchanged from the previous X-ray.

42. The next month, on February 27, 2019, Mr. Crowe met again with PT Henry and complained to him that the brace did not fit properly. Mr. Crowe stated the brace did not line his heel up with his ankle and leg, but rather forced his heel to unnaturally bend to the left side. PT Henry said Mr. Crowe would be called to the next Brace Clinic[3] for adjustments.

43. During this February 27, 2019, meeting, Mr. Crowe also told PT Henry that before sleeping, when Mr. Crowe would remove the brace, his foot and leg would immediately go into muscle spasms for ten to fifteen minutes. PT Henry said that this was normal. Mr. Crowe also pointed out to PT Henry that there was a bone or bones now protruding from the bottom of Mr. Crowe's ankle and that

---

[3] The Brace Clinic was an area of Federal Medical Center Butner that was used for John Doe Corporation 1 to fit and adjust its braces for the BOP.

Mr. Crowe had never seen this before. PT Henry falsely replied that Mr. Crowe's foot was actually like this all along.

44. In March of 2019, Mr. Crowe went to the Brace Clinic and met with the unknown providers of John Doe Corporation 1 who took his brace to make adjustments, and then returned with an updated brace the following week. During this period without the brace, Mr. Crowe began to have problems with his right knee, which was due to the dramatic change in his gait pattern—which was changing due to the deteriorating condition of his left foot. Specifically, Mr. Crowe would feel a pop on the inside of his right knee causing a distinct lump and creating excruciating pain, making him unable to walk for periods of time.

45. On April 3, 2019, PT Henry discharged Mr. Crowe from Physical Therapy, advising Mr. Crowe to keep wearing the brace, and telling Mr. Crowe that eventually Mr. Crowe would no longer need to use his cane. Mr. Crowe was advised to keep taking naproxen daily to manage his pain.

46. Three months later, in July of 2019, Mr. Crowe went to the medical facility ("Medical") to report about abrasions to his left foot and ankle caused by the bone now protruding from his ankle. Medical advised the Brace Clinic about Mr. Crowe's problem.

47. The Brace Clinic never made time to see Mr. Crowe or address his concerns.

48. On August 27, 2019, Mr. Crowe was transferred to Fort Dix, located in New Jersey. Mr. Crowe requested this transfer in order to be closer to his two adult sons so that visitation would be easier on them.

49. While in transit Mr. Crowe had to spend a few days in the Philadelphia Detention Center—a federal facility part of the BOP. On Friday, August 30, 2022, while being processed at the detention center, Mr. Crowe was required to stand for an hour and a half in a small room because at least one unknown BOP staff member (John Doe 1) considered Mr. Crowe's cane to be a deadly weapon.

9

Thus, Mr. Crowe could not be with the rest of the group and sit down, although his medical papers indicated "no prolonged standing." Mr. Crowe told officers about this issue, and in response was told by at least one BOP staff member (John Doe 2) "you will not be here much longer." This forced and prolonged standing caused more damage to Mr. Crowe's left foot, which became evident days later.

50. On September 1, 2019, while Mr. Crowe was wearing his brace, Mr. Crowe stood up from eating a meal and had a sudden and sharp pain in his left foot. The pain was so severe that Mr. Crowe could not put any weight on the foot. After the nurse came to see Mr. Crowe, he was issued a wheelchair for mobility, which he still is required to use to this day.

51. On September 5, 2019, the day after Mr. Crowe arrived at Fort Dix, Mr. Crowe was examined by Dr. Carl Sceusa, the resident medical doctor at Fort Dix. Although Mr. Crowe's foot looked deformed and Mr. Crowe needed a wheelchair for mobility, Dr. Sceusa was skeptical that there was anything wrong with Mr. Crowe's foot. Despite the urgency of the sudden and sharp pain in Mr. Crowe's foot, which was so severe that Mr. Crowe could no longer walk and needed a wheelchair for mobility, Mr. Crowe was merely scheduled for an in-house X-ray for the following week. Dr. Sceusa saw no need for immediate care.

52. On September 11, 2019, Mr. Crowe's foot and ankle were X-rayed which showed a new fracture of the left navicular bone and dislocation of several bones. This new fracture occurred on September of 2019, and occurred as a result of (1) the brace made for him, that he was told to wear; (2) the deliberate indifference of the medical staff to Mr. Crowe's deteriorating foot; and (3) the conditions he was forced to endure despite his disability.

53. On October 10, 2019, Mr. Crowe's foot was examined by podiatrist Dr. Barry Wisler on his regularly scheduled visit to the camp at Fort Dix. Dr. Wisler was the first doctor to examine Mr. Crowe's foot since Mr. Crowe entered the Bureau of Prisons in October of 2014. Dr. Wisler described

Mr. Crowe's problem as a "posterior tibia dysfunction" requiring "triple arthrodesis." Nothing further was done by Dr. Wisler.

54.   On November 19, 2019, Mr. Crowe's left knee began locking up and at times the ligament would bulge out, stopping Mr. Crowe's knee from bending or supporting any weight, causing severe pain. An X-ray on this day revealed "severe medial compartment joint spacing narrowing."

55.   On December 9, 2019, Dr. Thomas Bills examined Mr. Crowe on his regularly scheduled visit to the institution. Dr. Bills described Mr. Crowe's foot as having gross asymmetry to the alignment of his feet and ankles, stating that the left foot is in gross rotation laterally of the forefoot. Dr. Bills' impression was that Mr. Crowe had a neuropathic left foot and ankle of uncertain etiology. Dr. Bills ordered an MRI to be done to Mr. Crowe's foot and his foot to be examined by a neurologist and vascular consultant.

56.   Mr. Crowe was not experiencing any of these problems with his foot before the medical staff of the BOP intervened, and then failed to address Mr. Crowe's deteriorating foot which was worsening as a result of their intervention.

**2020**

57.   On January 24, 2020, Mr. Crowe had a CT scan—not the MRI Dr. Bills ordered—of his foot and ankle. The CT scan revealed, among other things, that there were "fractures identified involving the anterior calcaneus with fractures also involving the sustentaculum tali." Thus, although the dislocation of Mr. Crowe's bones first appeared on any X-ray in September of 2019, the medical staff did nothing to treat the worsening condition of Mr. Crowe's foot.

58.   On January 31, 2020, Mr. Crowe saw a neurologist—Dr. Scott Weaner—who examined the nerve function in Mr. Crowe's foot, which was now partially numb. Dr. Weaner noted that, while at the BOP, Mr. Crowe's conditioned had worsened and that his foot was now severely deformed. Dr.

11

Weaner also noted that the medical assistance Mr. Crowe had received at the BOP was "only…pain medications and bracing." Dr. Weaner stated that Mr. Crowe now likely needed foot and ankle "reconstructive surgery" due to his deformity.

59. On February 8, 2020, Mr. Crowe met again with Dr. Bills, the orthopedic surgeon, on Dr. Bills' regularly scheduled institutional visit. Dr. Bills now described Mr. Crowe's foot as "grossly deformed." Based on the vascular and neurologist reports and reviewing the new CT scan, Dr. Bills recommend surgical reconstruction of Mr. Crowe's foot at the earliest possible time to avoid further injury and pain. Dr. Bills explained to Mr. Crowe that due to the status of his injury Mr. Crowe would likely never walk normally again, because the condition of his foot is such that doctors are now unable to do a full reconstruction. Dr. Bills explained that the best surgery could likely do is realign the bones and fuse them together so that Mr. Crowe's foot will be solid and not moveable. Mr. Crowe's foot would not have been in this condition had he received the appropriate medical attention from the BOP medical staff, and/or the prison staff he had come in contact with provided him with the proper disability accommodations.

60. On March 17, 2020, the Regional Office of the Bureau of Prisons approved Mr. Crowe's foot surgery, which doctors stated needed to be done immediately. Despite this fact, unbelievably Mr. Crowe still has not had foot surgery to this day—over two years later.

61. Overall, neither the BOP nor its staff did anything to adequately and timely treat Mr. Crowe's fractured foot which occurred in September 2018 and 2019, and which occurred as a result of their actions and deliberate indifference, forcing Mr. Crowe's foot to become completely deformed. The BOP never scheduled Mr. Crowe for an emergency meeting with a doctor or surgery, and only had Mr. Crowe seen by the type of specialist he needed—a podiatrist and an orthopedic surgeon—when these doctors were scheduled to be in the institution with a list of other inmates to see. Neither the

BOP nor its staff ever ordered the MRI that Mr. Crowe's orthopedic surgeon requested several times, and the BOP and its staff did not follow the recommendations of the podiatrist and orthopedic surgeon for Mr. Crowe to have foot surgery.

62. On September 30, 2020, Mr. Crowe was released to home confinement in Atlanta. However, because Mr. Crowe's host had a licensing problem with the foster care agency she worked with, Mr. Crowe's host terminated his stay after two weeks. Mr. Crowe went back to halfway house Dismas Charities Atlanta West and was taken back into custody by the BOP on October 30, 2020.

63. On November 3, 2020, the Grand Prairie office of the BOP designated Mr. Crowe to go back to Fort Dix.

## **2021**

64. From October 30, 2020, through January 2021, Mr. Crowe was initially housed in the detention center in Atlanta. After more than 60 days in solitary confinement, where Mr. Crowe was placed because he was considered handicapped, Mr. Crowe was transferred to the transport hub in Oklahoma City. To get to Oklahoma City Mr. Crowe had to board a bus to the airport. Mr. Crowe was unable to walk up the stairs at the bus entrance, so an unknown BOP officer (John Doe 3) pulled Mr. Crowe up the stairs by a chain around Mr. Crowe's chest. At the airport on the tarmac Mr. Crowe was required to walk up the mobile staircase to board the plane. There were no accommodation made for someone handicapped like Mr. Crowe. Mr. Crowe experienced severe and tortured pain as he was forced to walk slowly up the tarmac, without assistance from unknown BOP officer (John Doe 4).

65. On February 22, 2021, Mr. Crowe spent approximately two months in Oklahoma City before he boarded a plane to Fort Dix. When the plane arrived in central Pennsylvania, there were six buses waiting on the tarmac to take inmates to six different institutions. When Mr. Crowe was called to deplane Mr. Crowe was told to walk down the stairs while one hand was restrained by handcuffs

Case 5:22-ct-03320-BO Document 83-1 Filed 06/22/23 Page 13 of 22

which were chained around his chest. Mr. Crowe could not securely hold onto the rail. With the help of another inmate Mr. Crowe made it down the stairs. There was no wheelchair available for Mr. Crowe so he was told by an unknown BOP officer (John Doe 5) to "walk to the bus number four." Mr. Crowe replied that he could not walk. Another unknown BOP officer (John Doe 6) provided Mr. Crowe with a walker and Mr. Crowe walked as far as he could until he collapsed on the ground. Mr. Crowe was dragged the rest of the way to a van by an unknown BOP officer (John Doe 7).

66. When Mr. Crowe arrived at Fort Dix, Mr. Crowe was interviewed by an PA Brien Orapello who took note of the extreme swelling. Mr. Crowe's foot, ankle and lower leg almost doubled in size as a result of the forced walk.

67. Mr. Crowe was advised at the initial intake process that he was not going to a Federal Prison Camp ("FPC") as the BOP office in Grand Prairie had him originally designated. Instead, Mr. Crowe was sent to the more secure Federal Corrections Institution ("FCI"), which has a double fence with razor wire surrounding the perimeter and limited movement between buildings, where a camp is open and more free flowing. A subsequent review of Mr. Crowe's records indicated this designation was in violation of BOP Policy Statement 5100.08, and the facility had no handicapped accommodations. For example, the facility Mr. Crowe was placed is spread out over many buildings. The dining room was a quarter of a mile from his dormitory and medical services were half a mile from his dormitory. The sidewalks were uneven, cracked and buckling, so that Mr. Crowe required someone to push him everywhere he went. The bathroom facilities were not handicapped accessible. To use a toilet Mr. Crowe had to leave the wheelchair outside of the stall, and pull himself from his wheelchair to the toilet or shower using anything he could grab or hold onto in order to keep himself from falling.

68. The shower had no grab bars or slip protection, so Mr. Crowe had to walk into the shower and sit on a chair he brought from his room.

69. On March 26, 2021, Mr. Crowe was examined by Doctor Patel in medical services. Dr. Patel was aghast at the condition of Mr. Crowe's foot and Dr. Patel observed that Mr. Crowe "was unable to stand or balance without assistance." Dr. Patel immediately raised Mr. Crowe's Care Level to Four, the highest level requiring Mr. Crowe to have help with hygiene and transportation, and Dr. Patel put Mr. Crowe in for a transfer to a medical facility.

70. On May 13, 2021, Mr. Crowe had an additional meeting with Dr. Bills, the orthopedic surgeon, via video call. Dr. Bills noted there was an MRI performed on Mr. Crowe's spine which Dr. Bills did not order. This was not the first mistake or delay involving an MRI. For example, on March 3, 2021, when Mr. Crowe first arrived at FCI Fort Dix, an MRI was ordered on Mr. Crowe's foot, but an MRI was conducted on Mr. Crowe's neck instead. Mr. Crowe never had any problems with his neck. Dr. Bills noted that he was still waiting for the MRI on my foot an ankle.

71. On May 22, 2021, while still at Fort Dix, Mr. Crowe's leg became very swollen. Mr. Crowe had a fever, chills and no appetite. Medical would not see Mr. Crowe as this was on a Saturday and they were busy.

72. On May 24, 2021, Medical ordered an x-ray of Mr. Crowe's foot. This was unlike other X-rays performed because the results were compared to the initial X-ray that was done on September 11, 2019, when Mr. Crowe first arrived at Fort Dix. The new X-ray read in part that there was a complete collapse of the hind foot, suggesting fracture/collapse of the talus and calcaneus. The X-ray suggested the deterioration significantly increased compared to the previous study.

73. Mr. Crowe's swelling was increasing and he was very weak. When the doctor finally examined his foot and leg, the doctor spent two minutes looking at Mr. Crowe and ordered him to the local hospital emergency room—Robert Woods Johnson Medical Center. Mr. Crowe had a severe case of cellulitis and an irregular heartbeat.

74. While in transport to the hospital, Mr. Crowe's legs were chained together, and he was handcuffed to a chain around his chest, although Mr. Crowe's custody level policy statement states that Mr. Crowe could travel without restraints. It then took three officers to push and shove Mr. Crowe in order to get him into the third seat of a van. There was no mode of wheelchair transportation.

75. Mr. Crowe was admitted to the hospital and remained there for four days, while they stabilized Mr. Crowe's heart. Mr. Crowe's medical condition was worsening as a result of the BOP's failure to immediately address his deteriorating limb, as a doctor stated needed to be done.

76. On May 27, 2021, Mr. Crowe was discharged from the hospital and quarantined for twelve days. No one from the prison Medical came by to check on Mr. Crowe's physical condition.

77. On June 7, 2021, after twelve days of quarantine, Mr. Crowe was then transferred to Federal Medical Center ("FMC") Devens in Ayer, MA.

78. Finally, on July 20, 2021, an MRI was done on Mr. Crowe's left foot. This is the MRI that Dr. Bills ordered in 2019, over a year and a half before.

79. On July 28, 2021, Mr. Crowe was taken to Beth Israel Deaconess Medical Center in Boston and saw Doctor John Wixted, an orthopedic surgeon for an consultation on his foot. Upon a very brief examination Doctor Wixted stated that Mr. Crowe needed to see a foot specialist and provided Mr. Crowe's escort with the name and phone number of Doctor Christopher Miller, his partner and orthopedic foot specialist. In the BOP medical report of the encounter it states that Mr. Crowe must see Dr. Miller in two to three weeks.

80. On November 10, 2021, Mr. Crowe finally saw Doctor Miller who gave him a thorough examination. Thus, while Dr. Wixed stated that Mr. Crowe needed to be evaluated within two or three weeks, Mr. Crowe was not seen for approximately one third of a year. Further, Dr. Miller was disappointed that FMC Devens did not send any of the previous X-rays or the MRI that was done to

Mr. Crowe's foot. Thus, Dr. Miller was unable to make any surgical plans. While still at Beth Israel that day Dr. Miller ordered a CT scan and regular X-ray of Mr. Crowe's foot, enabling Dr. Miller to make plans the next time they met.

81.   Dr. Miller wrote that Mr. Crowe "has a very severe issue. This is a chronic condition not at goal and he is high risk of limb amputation as a result of this condition. This is certainly a limb salvage situation."

82.   Because FMC Devens did not send X-rays to Dr. Miller, Dr Miller could not formulate a surgical plan, until he had new X-rays done. Thus, FMC Devens delayed the necessary immediate treatment.

<u>**2022**</u>

83.   On January 12, 2022, Mr. Crowe saw Dr. Miller again, and Dr. Miller was now ready to move forward with surgery on Mr. Crowe's foot. This was more than six months after Mr. Crowe arrived in FMC Devens, and over two years after doctor's initially stated that Mr. Crowe needed surgery. Now it was up to Mr. Crowe's medical team at FMC Devens to make the surgery arraignments.

84.   However, in early February of 2022, Doctor Ruiz, Mr. Crowe's FMC Devens doctor, told Mr. Crowe that Mr. Crowe had recently been awarded a year off his sentence under the First Step Act for the work Mr. Crowe did in programming—the classes offered by the BOP. As a result, Mr. Crowe was told that his release date was moved from April 12, 2023, to April 12, 2022. Consequently, Mr. Crowe was told that there was not sufficient time for Mr. Crowe to have the immediate foot surgery which he has needed for over 2 years.

85.   Regardless of Mr. Crowe's potential early release under the First Step Act, on April 11, 2022, Judge James Jones granted Mr. Crowe's motion for compassionate release—which Mr. Crowe filed on or about October 2021—ordering Mr. Crowe's immediate release from federal prison because of

the deteriorating condition of Mr. Crowe's foot, and because of the lack of medical care Mr. Crowe received.

86. In addition to the timeline above, Mr. Crowe also experienced deliberate indifference to his medical conditions on random occasions, as well as discrimination as a result of his handicap status. Specifically:

87. From September 2019 through January 2020, since the day Mr. Crowe arrived at FPC Fort Dix the handicapped showers were not working. Although Mr. Crowe vigorously and continuously complained to the staff, the handicapped shower did not get repaired for five months. In the meantime, Mr. Crowe had to take a shower in a stall measuring 36x36. Being unable to stand, Mr. Crowe needed to bring a chair into the stall with him. There was not much room in the shower for his 6'3" build and a chair. Further, there were no handles for Mr. Crowe to grip while getting in and out of the shower, and there was no shower wand. As a result of these conditions, Mr. Crowe was unable to take a satisfactory shower, and every shower Mr. Crowe took was a severe danger to himself, and he was in constant fear that he would slip, fall, and break his hip. The other inmates who did not have a disability were not subjected to these conditions.

88. From 2020 through 2021, in the thirteen months Mr. Crowe was at FPC Fort Dix Mr. Crowe was placed several times in quarantine for a total of over 90 days in anticipation of Mr. Crowe being released to home confinement. However, the quarantine facility did not have any handicapped bathroom facilities. Thus, Mr. Crowe had to get out of his wheelchair and walk multiple steps to use the toilet, and had to again take showers with a chair.

89. In September of 2019, Mr. Crowe told Counselor Silver that Mr. Crowe wanted to work in the UNICOR factory in order to take advantage of a program for increased time in a halfway house. Mr. Crowe had previously been on the UNICOR waiting list and was now eligible to work there.

Counselor Silver's reply was that there was nothing Mr. Crowe could do because of his condition, and Counselor Silver refused to discuss Mr. Crowe working at the camp either for Mr. Crowe to earn money or earn extra halfway house time under the First Step Act.

90. Overall, even though Defendants knew of Mr. Crowe's serious foot condition, had all of his medical records which documented his condition in detail, and had the ability to treat his serious injury, Defendants did not accommodate Mr. Crowe's disability, and met Mr. Crowe's pleas for help with deliberate indifference to his obvious pain and suffering, and inadequate medical care. As a result, Defendants deliberate indifference led to the worsening of Mr. Crowe's foot condition, leading a District Court Judge to grant Mr. Crowe's early release, citing the fact that a physician wrote that Mr. Crowe's foot "has a very serious issue. This is a chronic condition not at goal and he is at high risk of limb amputation as a result of this condition."

91. But for Defendants' wrongful acts, neglect, default, and wanton disregard for his medical condition, Mr. Crowe's foot would not be in the severe state that it is in, requiring potential amputation.

## INJURIES AND DAMAGES

92. As the further direct and proximate result of the failure of medical staff and prison staff at the BOP, as well as the known medical provider contracted with the BOP—Defendant Naphcare—to properly diagnose and treat Plaintiff's severe and excruciating pain in his left foot, Plaintiff has been permanently disabled and has lost the enjoyment of being physically active. Further, Plaintiff's left foot may require amputation.

93. Mr. Crowe developed diabetes shortly after he was confined to a wheelchair, but the BOP and its agents refused to treat Mr. Crowe's diabetes. At no time during the two and a half years that Mr. Crowe was confined to a wheelchair was he offered physical therapy to keep his leg muscles from

19

weakening. As a result, Mr. Crowe has been informed by his doctor that even if his foot surgery is successful Mr. Crowe may not be able to ever walk again.

94.  As the direct and proximate result of the negligence, carelessness, and medical malpractice of the Defendant U.S.'s employees and contractors, Mr. Crowe has suffered pain, mental anguish, bodily injury, and permanent disability, and will continue to suffer pain, mental anguish, bodily injury, and permanent disability in the future.

95.  As the direct and proximate result of the negligence, carelessness, and medical malpractice of the Defendant U.S.'s employees and contractors, Mr. Crowe now requires, and will require in the future, extensive surgery, special shoes and artificial limbs, for the shortened right leg, pain medication, and physical rehabilitation.

## CLAIMS FOR RELIEF

### Claim I: Violation of Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80, against Defendant U.S.

96.   Mr. Crowe repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

97.  The actions or omissions by federal employees described in this Complaint constitute numerous torts, including medical malpractice, negligence, gross negligence, and intentional infliction of emotional distress, under the laws of the State of North Carolina.

98.  Under the FTCA, Defendant U.S. is liable for these acts and omissions.

### Claim II: Violation of Eighth Amendment Rights—*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)—against Defendant Ramsey and John Does 1-7

99.  Mr. Crowe repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

20

100. To recover damages for a federal agent's violation of their constitutional rights, a plaintiff must establish a (1) constitutional violation (2) by individual federal defendants acting under color of federal law or authority. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

101. An individual has a cause of actions under the Eighth Amendment, pursuant to *Bivens*, if he can demonstrate that prison personnel were deliberately indifferent to his serious injury. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

102. Defendants Roscoe Ramsey and John Does 1-7 were deliberately indifferent to Mr. Crowe's serious injury to his left foot. This deliberate indifference caused Mr. Crowe severe pain—both physical and emotional—as well as further injury, and may require Mr. Crowe's left foot to be amputated.

#### Claim III & IV: Negligence and Negligent Retention against Defendant Naphcare

103. Mr. Crowe repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

104. Defendant Naphcare was the employer of Barry Wisler.

105. Under North Carolina law Defendant Naphcare can be held liable for the agent's torts committed in the course and scope of the agency relationship under the doctrine of *respondeat superior*.

106. Under North Carolina law Defendant Naphcare can also be held liable for negligence in employing or retaining an employee whose wrongful conduct injures another.

107. Defendant Naphcare was aware of the negligent acts of its employees at Fort Dix, including but not limited to Barry Wisler.

# PRAYER FOR RELIEF

WHEREFORE, Mr. Crowe prays the Court enter judgment for Mr. Crowe and order relief as follows:

A. Compensatory damages against all defendants, jointly and severally;

B. Punitive damages against all defendants, jointly and severally;

C. Reasonable attorneys' fees and costs,

D. Post-judgment interest; and

E. Such other relief as the court may deem just and proper

Respectfully submitted, the 12th day of June, 2023.

<div style="margin-left:45%">

*/s/ Blake A. Weiner* _____
Blake A. Weiner, VA Bar No. 94087
BLAKE WEINER LAW, PLLC
1806 Summit Avenue, Suite 300
Richmond, VA 23230
Telephone: (804) 482-1465
Email: bweiner@blakeweinerlaw.com
*Counsel for Plaintiff*

*/s/ Inez de Ondarza Simmons*
Inez de Ondarza Simmons
DE ONDARZA SIMMONS PLLC
4030 Wake Forest Road, Ste 319
Raleigh, NC 27609
(800) 678-9440
Fax: (844) 724-6804
Inez@deOndarzaSimmons.com
State Bar. No. 34303
Local Civil Rule 83.1(d) Counsel for Plaintiff

</div>